GEORGE R. MYERS et al.

*v.*

THE STEEL MACHINE COMPANY.

[Filed May 20th, 1904.]

1. The defendant, a machine company, agreed to sell to the complainants all of certain printing presses, with patent feeds, which the defendant company should manufacture, and to sell to no other person, provided the complainants should purchase all that the defendant should make. The defendant agreed to deliver at least two machines per month, and that "in the event of the party of the first part [the defendant] failing for three consecutive months to deliver said two machines per month, then the said party of the second part [the complainants] shall be at liberty to have such machines built by a responsible concern."—*Held*, this is not an alternative contract, giving an option to the manufacturing company to build the machines or not as it may choose. This clause is intended solely for the protection of the complainants in case the defendant shall fail to perform. The complainants may hold the defendant company to its agreement not to sell to anyone else, and may also, under the circumstances recited, seek to save themselves from loss, as far as they can, by procuring the machines to be made elsewhere.

2. The defence must stand on the issues made by the pleadings. Matters not set up in the pleadings as a defence, but introduced only in argument on the testimony, cannot be made the basis of the decision of the cause.

3. When a contract requires the defendant to do for the complainants, exclusively, some act calling for the exercise of skill or artistic capacity, equity will enforce the negative side of the agreement and will restrain the defendant from giving his services to any other than the complainants for whom he agreed to work, but it will not make a mandatory decree to compel the defendant to exercise his skill in specifically performing the contract.

On bill, answer and proofs.

This bill is filed by George R. Myers, Joseph T. Kavenaugh and George W. Howard, severally and jointly, trading as the American Machine Company, against the sole defendant, the Steel Machine Company, a corporation of this state, asking that the defendant company be restrained from selling or attempting to sell certain described printing presses, which it is alleged the defendant is about to do, contrary to the terms of an agreement made by the defendant with the complainants, and also asking that the defendant company may be decreed specifically to perform that agreement.

The complainants annex to the bill of complaint a copy of the agreement upon which they base their right to the relief they seek. It is made between the defendant, the Steel Machine Company, party of the first part, and the complainants, party of the second part. It is dated on the 21st day of December, 1901, and witnesses that the party of the first part (the Steel Machine Company, defendant) :

"Does hereby agree to sell to the said parties of the second part [the complainants in this cause], and the said parties of the second part do hereby agree to purchase of the said party of the first part, all the Johnston automatic printing presses, with ·automatic patent feeds, that the said party of the first part may manufacture, at the following schedule of prices: Size 1, 6 x 9, $350, with the W. G. Johnston feed; size of form No. 2, 10 x 15, $650, with the W. G. Johnston patent feed; size of form No. 3, 15 x 18, $800, with the W. G. Johnston patent feed. The said presses and feed to be tested, inspected and in perfect order before being packed and crated, and guaranteed to be in good working order when put up for running, all breakage by transportation to be replaced by said party of the first part, and all parts not complete to be furnished free of charge, payment for said presses and patent feed to be made in thirty days from delivery or two per cent. off for cash payment on presentation of bill of lading.

"The said party of the first part agrees to manufacture and to continue to manufacture the Johnston automatic printing press, with feed, with due diligence, barring strikes and other uncontrollable delays, and to sell the said machines to the parties of the second part and to no other person or persons, in the United States, Great Britain and Canada; provided, however, that the said parties of the second part shall purchase from the said party of the first part all the Johnston automatic presses, with feeds, the party of the first part shall manufacture; and provided

further, that in case the parties of the second part shall fail to purchase from the party of the first part all machines manufactured as aforesaid for a period of three months, that then and in that event the party of the first part reserves the right to sell to other parties such machines as they may have on hand undisposed of at prices not less than those quoted or sold for by the parties of the second part. And the party of the first part agrees to deliver at least two machines per month during each month, beginning with January 1st, 1902, and in the event of the said party of the first part failing for three consecutive months to deliver said two machines per month, then the said parties of the second part shall be at liberty to have such machines built by a responsible concern, paying the said party of the first part the difference in its costs and the aforesaid selling price."

The complainants further allege that, acting upon the said agreement securing to them the exclusive privilege of purchasing the printing presses therein described, they spent large sums of money for advertising and inviting purchasers to buy from them, relying on the agreement in question as their protection; that they have delivered to the defendant company orders for $32,000 worth of the machines in question, but that the defendant company has failed and refused to deliver such machines in good working order.

The complainants set forth in detail the names of vendees from whom they obtained agreements to purchase the presses, which agreements, the complainants say, they have been unable to fulfill because the defendant company has refused and failed to carry out their agreement.

The bill of complaint further states that the Johnston automatic printing presses, with patent feed (the machines which the defendant agreed to manufacture and of which the complainants were to have the exclusive sale), are built under letters-patent issued to one William G. Johnston, who has assigned the same to George G. Green, president of the defendant company, in trust for the use of that company. That the complainants have been unable to avail themselves of the privilege given them by the agreement (in case the defendant failed for three consecutive months to deliver two machines a month) to build said machines themselves or obtain them to be built, because the defendant company has in its possession all the drawings, patents

and patterns relating to the construction of those machines. The complainants charge that the defendant company, with intent to deprive the complainants of the benefits secured to them by the said contract, has refused to deliver said presses although they have at least four manufactured and ready for delivery, which they have offered to sell to other persons than the complainants at lower prices than those at which the complainants have been offering to sell them. That these acts of the defendant company are in fraud of the complainants' rights and are contrary to the express provisions of said agreement, which declares that the defendant company, if it sells any presses to other parties than the complainants, must sell them at prices not less than those for which the complainants offer said machines for sale, and that under said agreement the defendant can only sell at those prices in case the complainants shall fail to take and pay for the machines as provided in the contract, and the complainants aver that they have not refused to accept said machines, but, on the contrary, they say they have always been ready to accept the same, that the defendant company has refused to deliver them.

The bill of complaint contains a clause alleging the insolvency of the defendant company and the illegal issue of its stock. This charge and any relief sought thereon was abandoned at the hearing of the cause.

The complainants pray that the Steel Machine Company, defendant, may be decreed specifically to perform the agreement of the 21st day of December, 1901, set forth in the bill of complaint; that it may be enjoined from selling, or attempting to sell, the machines referred to in that agreement, contrary to the terms thereof, to any other persons than the complainants, and from advertising that it is authorized to sell said machines, and from selling or disposing, or attempting to sell or dispose, of the patent rights under which the machines were built.

A preliminary injunction was allowed after a hearing, restraining the defendant company from selling or attempting to sell in the United States, Great Britain or Canada, Johnston automatic printing presses, with the Johnston patent feed, to any

other person or persons than the complainant and for the prices at which they are sold by the complainants.

The defendant company has answered the bill of complaint. It admits the execution and delivery of the agreement, copy whereof is annexed to the bill of complaint, and leaves the complainants to prove what they may have done and expended in efforts to advertise and sell the machines in question. It admits that the complainants had placed with the defendant company several orders for machines, and alleges that it had carried out its contract with the complainants so far as it was permitted to do by the complainants.

It denies that the defendant company's failure to furnish two machines a month is in any way attributable to the defendant, and that the complainants' inability to carry out any contracts that they may have made for the delivery of the machines was in any way due to the defendant company's f ilure to perform its contract with the complainants.

The defendant admits that the machines in question are manufactured, built and constructed under letters-patent granted by the government to William G. Johnston, and that Johnston has assigned said patents to the defendant company; but it denies that the said machines can be built under any letters-patent about to be granted by the government to George G. Green, as trustee for the defendant company. The defendant denies that it has failed to furnish any of the machines in good working order to the complainants under said agreement, and denies that in fraud of the contract, or for the purpose of breaking the same, it has refused to deliver said machines; denies that it has on hand any of said machines except two, which were shipped to the complainants under the contract after approval by them and which they subsequently returned. The defendant company further denies that it has offered the said machines for sale in violation of said agreement and expressly denies that it has offered to sell them to the parties named in the bill of complaint.

The defendant then states the circumstances of the case to be that in the month of December, 1901, George G. Green was applied to by William Johnston and William G. Johnston to

form a company for the manufacture of the said machines to be known as the Johnston automatic printing press and the William G. Johnston patent feed, combined; that subsequently the complainant Kavenaugh represented to said Green that he (Kavenaugh) was a member of the American Machine Company, which had a contract with the Johnstons, under which the American Machine Company held the exclusive agency for the sale of said machines in the United States, Great Britain and Canada, requiring the delivery of two machines per month; that he (Kavenaugh) had filed a bill in the court of chancery to restrain the Johnstons from disposing of the patent right for said machine or selling them to any other person than the American Machine Company, and to compel the Johnstons to perform their said contract. Kavenaugh proposed to said Green that if he (Green) would form a company and furnish the necessary capital to manufacture the machines; that it would be a very profitable investment, and that he (Kavenaugh) had large orders for the purchase of said machines. He offered to discontinue the suit against Johnstons, provided he could secure a similar contract from the company to be formed by said Green and he (Kavenaugh) be reimbursed his expenses of the chancery suit, with some other claims which he had against the Johnstons, amounting to about $400.

The defendant alleges that on these representations the defendant company was organized and that it paid the $400 and entered into the agreement set forth in the bill of complaint, and invested $5,000 for tools and equipments for the manufacture of the said machines in compliance with the terms of said contract; that one machine was built (after some delay occasioned by changes suggested by the complainant Kavenaugh) strictly in accordance with the plans of the Johnston automatic printing press and William G. Johnston patent feed, and was in perfect running order exhibited by the defendant company at the factory, was seen and approved by the complainant Kavenaugh and accepted by him, and ordered shipped, on March 12th, 1902, to his address at the Bourse, in Philadelphia, where he received it and placed it on exhibition to the general public.

20

Another machine was built for the complainant Kavenaugh in like manner, and was, on April 16th, 1902, shipped in his name to John Wanamaker's store, in Philadelphia, and there received and exhibited by him to the general public; that neither the complainant Kavenaugh nor the American Machine Company paid for said machine according to the provisions of the contract, and when pressed for payment by the defendant the said Kavenaugh returned said machines to said defendant.

The defendant, further answering, says that at the request of the complainant Kavenaugh the defendant company agreed to furnish to the complainants another printing press of an entirely different pattern and construction from the one called for by the contract, and it was agreed that the said machine was not furnished under said contract, nor governed by the terms thereof, except that the price of the machine was the same, namely, $350, which it was agreed should be paid upon its delivery at Wanamaker's, and that the title thereto should not pass until such payment was made; that the machine was put up and run at the defendant company's factory in the presence of the complainant Kavenaugh and was approved by him and shipped to Wanamaker's by his direction, where it was set up and worked perfectly; that said Kavenaugh did not pay for the machine as he had agreed to do; that the defendant company directed Wanamaker not to pay the complainant Kavenaugh for it, after which the complainant Kavenaugh removed the machine from Wanamaker's and secreted it, so that the defendant company has been unable to recover it, and the complainant Kavenaugh still refuses to pay for it.

The defendant company alleges that it made the contract in question with the complainants in good faith and has endeavored on its part to carry out its terms, but has been prevented from furnishing the number of machines contracted for by the fraudulent conduct of the complainants in refusing to pay for the same, and that the defendant is under no obligation to continue to manufacture the machines after the complainants' failure to accept and pay for them.

The defendant company further insists that a full and adequate

remedy for any violation of the contract is therein provided for, as the matters set up in the complainants' bill are matters which should be tried at law and in respect to which the complainants are not entitled to any equitable relief, and the defendant company asks the same benefit of this defence as if it had demurred to the bill of complaint.

The cause came to a hearing on these pleadings.

*Mr. Spencer Simpson* and *Mr. Joseph H. Gaskill,* for the complainants.

*Mr. Austin H. Swackhamer* and *Mr. John W. Wescott,* with whom was *Mr. Horace Pettit* (of the Philadelphia bar), for the defendant.

GREY, V. C.

Some portion of the argument has been devoted to an ascertainment of the rights of the parties by construction of the contract of December 21st, 1901. The defendant contends that the contract by its express terms provides for the failure of the defendant to build the machines and furnishes to the complainants the exclusive remedy for such a failure. This is found in the clause which declared that

"in case the party of the first part [the defendant company] shall fail for three consecutive months to deliver two machines per month, then the complainants shall be at liberty to have such machines built by a responsible concern, paying the said party of the first part the difference in its costs and the aforesaid selling price."

The defendant insists that this clause protects the defendant company against conducting the business at a loss; that under this provision the defendant may build the machines or not at its option; that so long as it is profitable to build machines at the stated schedule of prices the defendant would be likely to furnish the machines, but as soon as the business was conducted at a loss it would most likely quit. The defendant refers to the cases of

*O'Connor* v. *Tyrrell, 53 N. J. Eq.* (*8 Dick.*) *15,* and *Crane* v. *Peer, 43 N. J. Eq.* (*16 Stew.*) *553,* as sustaining this view.

The counsel for the defendant has, I think, correctly stated the results which would probably follow such a construction of the contract, but I cannot find that the clause referred to has any such meaning. There is a definite agreement on the part of the defendant company to do a certain act, and an option is given (not to the defendant but to the complainants) in case the defendant fails to do that act, to arrange with someone else to do the act at no greater cost to the complainants. The agreement binds the defendant to perform. The right to secure performance by some other person lies with the complainants alone and is for their protection and at their choice. Nothing in the agreement gives to the defendant an election to perform, or to refuse to do so, and take the difference between cost and the price named in the agreement. Nor does anything in the contract declare that if the complainants (under the circumstances named in the agreement) choose to have machines made by someone else that choice shall relieve the defendant company from its obligation to make and furnish the minimum number of machines required by the contract. This clause is intended for the protection of the complainants in case the defendant fails to perform; it cannot justly be perverted into a waiting option under which the defendant may safely refuse to perform whenever it finds it profitable to do so. From this point of view the complainants are at liberty to hold the defendant company to its agreement not to sell to anyone else, while at the same time seeking to save themselves as far as may be by procuring the machines to be made elsewhere.

The cases cited by the defendant do not support its contention. They do discuss the effect of alternative contracts, but they have no direct application to the case now under consideration. They hold in substance that an agreement to do an act with a provision that a named sum in liquidated damages may be recovered on non-performance does not, *per se,* render the contract an optional one, enabling the parties to choose between the performance and the payment of the liquidated damages; and that

whether the contract is alternative or not is to be ascertained from all its terms and their application to the subject-matter. This view, so far as it is applicable, disfavors the argument of the defendant, for, as is above shown, the phrasing of the agreement in this respect obliges the defendant company to perform and gives it no option whatever to take any alternative course.

It is not denied that the contract on its face obliges the defendant company to make and deliver to the complainants at least two machines per month, beginning January 1st, 1902. The machines were by the terms of the contract to be "tested, inspected and in perfect order before being packed and crated and guaranteed to be in good working order when put up for running." The testimony, while quite contradictory on many points, is entirely uniform in its showing that the defendant company, though constantly urged by the complainants to furnish the machines, did not in fact comply with its contract and the complainants' solicitations for performance. The defendant does not claim that it either did or could furnish two perfected machines per month. The testimony shows that from January, 1902, when delivery should have begun, until June of that year (when the bill of complaint in this cause was filed) the complainants were constantly demanding performance and the defendant company as constantly excusing itself. Two or three machines were furnished during the five months from January to May, 1902, but none appear to have been "in good working order when put up for running."

The oral testimony on this point is contradictory to some extent as to the "good working order" of the machines furnished, but no one claims that two perfected machines per month were furnished or even that the defendant company could during January, February, March and April, 1902, turn out that number, as it had agreed to do.

It is now claimed by the defendant company that the two or three machines which were supplied were accepted by the complainants, and that the reason of the differences between the parties was the failure of the complainants to pay for them. The oral testimony on this point, as on almost every other, is

quite contradictory, but the letters exchanged between the parties at the time these events were taking place show that the real point of difference was based on the fact that none of the machines furnished were "in good working order when put up for running." On the contrary, they constantly failed to meet the requirements of ordinary continued use, and the defendant company itself recognized this by a profession of efforts to better and improve them. No question of failure to pay could, under the contract, properly have been raised until thirty days after the delivery of a machine in good working order when put up for running. No such machine was in fact delivered. The correspondence does not bear out the defendant's claim that the complainants' refusal to pay was the cause of the defendant's failure to supply the machines. This excuse seems to be an afterthought.

There is testimony which goes to show that the defendant company's officers deliberately planned a breach of its contract to supply the machines to the complainants in order that a higher than the contract price might be obtained by sales of the improved machines to other persons. This bad faith is strenuously denied. In the view I take of the matter I have not found it necessary to determine the contradictions of the witnesses on this question.

Under the terms of the contract, two perfected machines should have been shipped in January, 1902; two more in each succeeding month. In fact, none were furnished in January, none in February, but one in March, and that was not "in good working order when put up for running," and but one in April, which was open to the same criticism.

The machines appear to have worked experimentally, but not to have been within the requirements of the contract that they should be in "good working order when put up for running," which obviously means that the machine should be so perfected that when put in place to run for the purpose for which it was made it should be in good working order.

The differences between the parties touching the failure of the defendant company to furnish a perfect machine continued,

as is shown by the correspondence, from January to May, 1902. On May 6th, 1902, the president of the defendant company wrote to the complainants that the defendant company

"is pushing our new presses as rapidly as possible. * * * I will be able to show you a press complete and in perfect working order next Monday; something entirely new, and which I know you will be delighted over, and think there is no doubt that we will be able to complete four this month and two others to follow in a couple of weeks."

This letter was written by the defendant company to the complainants after four months of failure on the part of the defendant to fulfill its contract by supplying a good working machine, notwithstanding the complainants' constant solicitations that the defendant should perfect and deliver the machine. The letter is plainly written from the point of view of one who feels himself to have been at fault in the past towards the party to whom the letter is written, and who seeks to remove previous cause of complaint by the showing that he had now attained the object sought—"a press complete and in perfect working order." The fact that it was written to the complainants, who held the defendant's contract to furnish a press in good working order, and the reference to the defendant's ability to complete a number of the new presses in the near future, also indicate that the writer understood that the so-called new presses were the perfected machines which would thereafter enable the defendant company to fulfill its contract.

Nothing in the above-mentioned letter of May 6th, or in any of the previous correspondence, raised any question about the complainants' failure to pay for the machines, or suggested that the defendant's new press was outside the operation of the contract of December 21st, 1901. The complainants evidently so understood the situation, for on May 21st they insisted, by letter, on the delivery of the press under the contract. The defendant company, by telegrams, declined to ship the press until arrangements were made with them, thus ignoring the terms of the contract which arranged for payments for the machines to be made in thirty days after they were delivered. On May 26th, 1902, the

defendant company, for the first time, formally showed its purpose to deny that its perfected press was within the terms of its contract of December 21st, 1901. On that day the defendant company wrote the complainants, referring to a meeting of the company on the preceding Saturday night, stating, in terms, that it did not "hold itself under any obligation to forward this new press under the original contract," but intimating that this matter could be arranged in the near future. About the same time Colonel Green, the president of the defendant company, intimated to the complainants that new terms regarding the furnishing of the perfected press could be arranged, and it is also shown that the complainants, who had never yet received from the defendant company a single machine "in good working order when put up for running," as required by the contract, insisted that the defendant was bound to furnish a perfected press. No basis of settlement was reached and the bill of complaint was filed on June 23d, 1902.

The evidence shows that the defendant company failed, and I think that it intended to fail, to perform its contract of December 21st, 1901.

Several suggestions are made by the defendant company to avoid the enforcement of its contract in this suit. It is claimed that the complainants' partnership has been dissolved and its assets, including the contract now in dispute, transferred to a new company.

The defendant company's answer admits that it entered into the contract with the complainants, and sets up no claim that they had dissolved and had assigned or transferred the contract, or were in any way incapable of enforcing it. On the contrary, the defence, as pleaded, is that the defendant company had always recognized the complainants as entitled to performance of the contract and had in fact performed it to them.

The defendant also contends that the contract of December 21st, 1901, was obtained from the defendant by false representations made by Mr. Kavenaugh, one of the complainants, concerning the financial standing of his partners—Meyers and

Howard. This contention is open to the same objection that it has not been put in issue.

The defence must stand on the issues made by the pleadings and not on argument based on matters suggested from the evidence only and not even referred to in the pleadings. *Riddle* v. *Keller, 61 N. J. Eq.* ·(*16 Dick.*) *521,* collating cases on this point. The weight of the evidence, if it should be considered, also fails to support these claims of the defendant company.

The defendant also contends that the defendant company ought not to be restrained from breach of its contract, because, looking at the contract from the standpoint most favorable to the complainants, the construction of the contract is doubtful. In my judgment the contract itself is expressed with sufficient certainty to enable the court to declare what the parties intended. Whatever doubts there are have come into the case not because of the terms of the contract, as it is expressed, but by reason of subsequently happening circumstances and of questions whether the contract is applicable to those after incidents.

The contract shows that the defendant company agreed to furnish a certain number and kind of automatic presses, with feeds attached, at certain times for a named price, exclusively to the complainants, and the proof shows that the defendant has not only not furnished those machines, as it agreed to do, but that it has sought to avoid the performance of that contract by manifesting a purpose to sell the machines to other persons than the complainants.

It is also objected that the contract gives the complainants a monopoly on Johnston's invention and is therefore against public policy. The rule regarding contracts in restraint of trade is based on the fear that an agreement which prevents a man from earning his living may deprive the public of the benefit of his labor and skill and compel him to depend upon the public for his support. This contract does not prevent the defendant company from producing the machines; on the contrary, the contract obliges it to produce them. It does not deprive the public of their use, for the obvious purpose of the complainants in purchasing them is to sell them again to the general public.

While by the terms of the contract the defendant may not sell to any other persons than the complainants, this condition, by the same contract, exists only so long as the complainants purchase all of the machines which the defendant may manufacture. The right of the public to have the ultimate benefit of the production of the machines is therefore plainly secured on the face of the contract itself.

The circumstances of the case justify the allowance of an injunction restraining the defendant company from selling or attempting to sell Johnston automatic printing presses, with the Johnston patent feed, to any other person or persons than the complainants, contrary to the terms of the defendant's agreement.

The complainants insist that they are entitled to a decree which shall compel the defendant company specifically to perform its agreement according to its terms.

There is a class of cases in which the agreement sought to be enforced is sufficiently established and the obligation of the defendant is conclusively shown but in which courts of equity refuse to make a mandatory decree for specific performance. These decisions have been given on contracts which require the defendant to do some personal act, because of his artistic capacity or skill in that matter—as an engagement to sing at a theatre and not elsewhere (*Lumley* v. *Wagner, 1 DeG. M. & G. 604*), or to build a house. *Errington* v. *Aynesly, 2 Bro. Ch. Cas. 343.* In such cases equity will enforce a negative covenant and restrain the defendant from giving another than the complainant (whom he contracted exclusively to serve) the benefit of his skill, but it will not make a mandatory decree to compel the defendant to exercise his art in the actual performance of the contract. *Lumley* v. *Wagner, ubi supra; Montague* v. *Flockton, 16 Eng. Eq. 189.*

In the case at bar the defendant company has agreed to manufacture and sell to the complainants (and to no one else so long as the complainants take all that the defendant shall produce) certain machines, which shall be "in good working order when put up for running." The evidence shows that a considerable degree of mechanical skill is required to produce the machine

in question in such perfection of performance that when put up for running it shall be in good working order. This court cannot compel the continued exercise of personal skill in the production and sale to complainants of a succession of perfectly working machines. It will not, for this reason, make a decree requiring such acts to be done. It may and will, however, restrain the defendant company, which agreed to do those acts exclusively for the complainants, from doing them for or with any other person.

For these reasons the complainants should have an injunction to enforce the negative covenants of the contract of December 21st, 1901.

I will advise a decree accordingly.