American Player Piano Company, Appellee, v. American Pneumatic Action Company et al., Appellants.

SALES: Warranties—When Not Implied—Known, Described and Definite Article. He who contracts for a definitely defined, known and described article must, if he wishes to protect himself against a failure of the article to accomplish the purpose for which it is intended, exact an *express* warranty. No such warranty will be *implied.* The distinction lies between (a) contracting for an article for a special purpose and (b) contracting for a special article for a special purpose.

PRINCIPLE APPLIED: Action for ·damages for breach of contract. The plaintiff company was organized to sell piano players manufactured by defendant. Plaintiff's chief organizer was interested in and familiar with the patent, assisted in organizing the defendant company to manufacture the players, was its superintendent in manufacturing the player, assisted in perfecting and testing it, and knew that defendant was manufacturing but one kind of player. Defendant agreed to furnish, and the organizers agreed to buy, a certain number of players *"of the latest and best type now being manufactured by defendant under inventions of E. T. Turney . . . at the date hereof, which type shall be designated 'Type A' and shall correspond with a sample to be marked, set apart and kept by defendant as a standard for a comparison in the future. All such* (piano players) *. . . shall be expressly warranted by defendant to be of first class material and workmanship, free from flaws and defects and in good working order at time of delivery."* The contract contemplated that the instrument should be further perfected and,· in case of new inventions, contemplated the possible substitution of a new type in place of Type A. If a new type were agreed upon, it should thereafter be the standard which defendant was to furnish.

The first parties to this contract (plaintiff's organizers) actually selected the sample to be marked and set aside as the standard under the contract. The organizers then assigned the contract to plaintiff. Defendant delivered to plaintiff piano players which, at time of delivery, (a) corresponded to Type A, (b) were of first class material and workmanship, (c) were free from flaws and defects, as respects material and workmanship, and (d) were in good working order. Defendant never refused to continue such deliveries. The instrument worked well when first installed, but soon proved imperfect and unsatisfactory, owing to atmospheric conditions.

*Held,* defendant did not contract to furnish to plaintiff a faultless instrument; that the failure of the instrument to perform the work expected of it was not a breach of the contract by defendant; that no such warranty would be implied.

DEEMER, C. J., and WEAVER, J., dissent.

*Appeal from Scott District Court.*—HON. A. J. HOUSE, Judge.

WEDNESDAY, OCTOBER 6, 1915.

ACTION to recover liquidated damages for failure to deliver certain pneumatic piano players in accordance with

the terms of a certain contract between the parties. The opinion discloses the facts upon which the suit is predicated. Judgment below for the plaintiff. Defendant appeals.— *Reversed.*

*Bollinger & Block,* for appellants.

*Cook & Balluff,* for appellees.

GAYNOR, J.—This action is based upon the following contract, executed the 8th day of February, 1910. In the contract, the defendant is designated as party of the first part, and the plaintiff, party of the second part.

"It is hereby mutually agreed by and between the parties as follows, to wit:

"That first party shall, for and during the period of one year from and after the 15th day of March, A. D. 1910, sell to second parties, for sale by second parties in the United States of America or anywhere, three hundred and sixty-four pneumatic player actions of the latest and best type, now being manufactured by first party under the inventions of Mr. Eugene T. Turney, of Davenport, Iowa, at the date hereof, which said type shall be designated, 'Type A', and shall correspond with a sample to be marked, set apart, and kept by first party as a standard for a comparison in the future, in the manner and upon the terms hereinafter specified, and shall sell no other player actions save as hereinafter provided.

"That all such player actions shall be delivered by first party to second parties at first party's factory in Davenport, Iowa, at the rate of seven each week for each calendar week during such year, and shall, if second parties so elect, be properly installed in pianos furnished by second parties, and shall be expressly warranted by first party to be of first-class material and workmanship, free from flaws or defects, and in good working order at the time of delivery.

"That if second parties elect to have such actions installed in pianos by first party, they shall deliver to first party at first party's factory in the city of Davenport, Iowa, a sufficient number of pianos at times sufficiently early to fairly enable first party to make the installation agreed upon, and shall each week remove from first party's factory at least seven of such actions either installed in pianos furnished by second parties, or uninstalled, as second parties may have previously elected.

"That second parties shall pay to first party the sum of eighty dollars for each player action so furnished and delivered within thirty days after such delivery.

"That the pianos so to be furnished by second parties to have actions installed therein, shall be upright of good make, and in sound condition, having cases not less than four feet six inches high, 'stickers' or 'risers' at least six inches long, and a clear interior space at least five inches wide between the inside of the upper panel and the front ends of the tuning pins.

"Second parties shall receive and take from first party's factory each week the same number of actions which first party has agreed, pursuant to this contract, or any extension or modification thereof hereinabove provided for, to install or deliver each week to second parties, and shall pay for each such action at the price agreed upon, within thirty days from and after such receipt of the same by second parties.

"In the event that second parties shall fail to receive and take away the actions hereinabove agreed to be received by them each week, or shall fail to pay for any such actions within thirty days after second parties' receipt of the same, then first party shall have the option and election either to terminate this contract, or to sell the player actions, which second parties so failed to take, in any territory, to any person, firm, or corporation, at the best price offered therefor, and collect the difference, if any, between such selling price and the price provided by this contract, from second parties

as agreed and liquidated damage for the breach of this contract caused by each such failure of second parties; but before second parties shall be deemed to have so failed to receive or pay for any such player actions, first party shall notify second parties in writing that it intends to claim a breach of this contract, and stating its election on account of such breach, giving the number of pianos which second parties have failed to take or pay for, as the case may be, and the several dates of such failures, and thereupon, second parties may avoid the forfeiture and damages herein provided for, by taking possession of such pianos or making payment, as the case may be, within five days after the receipt of such written notice.

"In the event that first party shall fail to furnish second parties any player action as agreed upon in this contract, or any modification or extension thereof herein provided for, second parties shall have the option and election to terminate this contract, or to receive from first party, as liquidated damage, the sum of twenty dollars for each player action which first party so fails to furnish.

"Second parties agree to furnish all pianos called for by this contract, at first party's factory at Davenport, Iowa, at their own cost and expense, and to remove all such pianos, when players have been installed, from such factory at their own cost and expense."

It is claimed that defendant failed, neglected and refused to furnish seven player actions each week from and after March 15, 1910; that, during the period from March 3, 1910, until August 13, 1910, the defendant furnished and delivered to the plaintiff only twenty-five player piano actions; that from and after August 13, 1910, defendant failed or refused to furnish any actions whatever to the plaintiff, although plaintiff demanded the same, and was ready and willing to receive actions of the kind provided for in the contract.

I. To properly understand the rights of these parties

under this contract, and to apply the law to the contract in disposing of these rights, it is necessary that we have at the outset an understanding of what the parties undertook and agreed to do in the contract. To this end, it is necessary that we have before us a brief history of the situation as it then existed, and the relationship of the parties to the situation, and to the subject-matter of the contract.

SALES: known, described, and definite articles: warranty not implied.

The contract sued on was originally entered into between the defendant, the American Pneumatic Action Company, and Paul H. Johnston, C. I. Josephson, and George W. Rundquist. The plaintiff is the successor to all the rights in the contract obtained by Johnston, Josephson and Rundquist. It is a corporation, organized as such by Johnston and his associates, to sell these automatic player actions, under the Turney patent mentioned in the contract. About the year 1910, Johnston became interested in a proposed automatic piano player, the invention of Mr. E. T. Turney, and took part in the formation of a company for the purpose of *manufacturing* these players under that patent. The company was known as the American Pneumatic Action Company. This company, at the time Johnston was connected with it, manufactured these automatic players, and they were tried out and played. He later severed his connection with that company, and arranged to form a company to *sell* the actions manufactured by the Automatic Action Company, and associated with him the parties named in the contract. The piano player referred to in the contract was the piano player invented by Turney, and the one then being manufactured. There was only one kind of player action made at the time of the contract,— that is, one style under the Turney patent.

In speaking of the machine to be set apart and marked and labeled the standard, Johnston said:

"We expected to get the developments of the machine as it was being developed, with these improvements, from time

to time that would make it more and more perfect. We expected a rigid, fixed type of machine when they arrived at a machine that would fill the bill properly."

Johnston was familiar with the design and plans of the Turney machine. He was at the factory frequently, and was superintendent up to the time the defendant company was reorganized, very close to the time that the contract in question was made, and was in the factory frequently after that time; was in the manufacturing and testing rooms; saw tests being made; made suggestions as to what could be done to overcome defects in design and plan. He was instrumental in forming the plaintiff company, in connection with his associates in the contract. It was he who took up with defendant company the negotiations which resulted in the contract in question. The plaintiff company was organized subsequent to the making of the contract in question.

The evidence tends to show that these automatic players when first installed would play all right, but after they had been sent out and used a while, they leaked. That was due to atmospheric conditions that affected the diaphragm used in the wind chest cord. Defendant company attempted to remedy these defects; put in new diaphragms and tried them over again. There is evidence that these piano players, when sent out, were returned at first, for the reason that they would not stand up, but leaked,—due, as the evidence tends to show, to atmospheric conditions. The design, the scheme, the plan was not perfected so as to make them, even when constructed according to the Turney patent, perfect in their operation. There is no question that the machines manufactured and delivered to the plaintiffs were made of first class material and workmanship, free from flaws and defects in this respect, and in good working order at the time, for the type and design after which they were made. There is no claim that they did not correspond with the sample referred to in the contract as "Type A", then being manufactured by

defendant company. This type, it was agreed, should be set apart and kept by the first party as a standard for comparison in the future.

It was further stipulated in the contract that, if the defendant company invented or discovered or acquired the right to use improvements in such player action, it might propose to the plaintiff to substitute such improvement or such improved forms for the type mentioned in the contract, the price to be agreed upon between the parties, and an election given the plaintiff to accept or reject the improvements.

It was further stipulated that, if improvements were made and the plaintiff was notified of such improvements, it might elect to substitute the improvements or the improved form or type at a price to be fixed, or it might continue to require the delivery, under the contract, of "Type A" action.

It was further stipulated:

"In the event that plaintiff accept such proposition, within thirty days thereafter, consenting to the substitution of an improved type of action for said Type A, second party shall not thereafter have the right to require a return of said Type A action, but such improved type and price shall thereupon become the standard, and may in turn be supplemented by further improved types in the same manner provided for the supplanting of 'Type A' action, and in the event there be a substitution of an improved type for the one mentioned in the contract, such improved type should be properly marked for identification, and kept as a standard for comparison, in place of the one for which it was substituted."

The agreement, as expressed in the contract, is that, during the year following the 15th of March, 1910, the defendant shall sell to the plaintiff, to be resold by the plaintiff, automatic player actions of the latest and best type *now being manufactured by the first party, under the inventions of Eugene T. Turney*, at the date of making the contract.

The type of machine agreed upon was the type now being manufactured under the invention of Turney. This type was to be designated as "Type A", and was to be the latest and best of that type, and was to correspond in every way with that type. This "Type A" was to be set apart as a standard for comparison in the future. It was agreed that this "Type A", which should be made to correspond with the type then manufactured by the company, should be of first class material and workmanship, free from flaws or defects, and in good working order at the time of delivery. This is all that the defendant agreed to give the plaintiff.

The plaintiff, through its Mr. Johnston, was familiar with the type of player action manufactured by the defendant at the time the contract was made. He acted for the parties to whose rights the plaintiff succeeded, in making the contract. He selected the type to be used as a standard for comparison in the future. It was with reference to this type of machine, then manufactured, that the warranty was made, and the warranty only bound the defendant to make this type of first class material and workmanship, free from flaws or defects, and in good working order at the time of delivery; that is, that the defendant would reproduce and sell to the plaintiff a machine that corresponded with "Type A", and that this "Type A" should be manufactured of first class material and workmanship. There is no warranty or guaranty in the contract that it would perform its work, and no implied warranty that it would do more than "Type A" (as then manufactured and set apart as a comparison in the future) was capable of doing. The plaintiff selected the machine to be constructed in accordance with the inventions of Turney, and specifically designated in the contract that it should be, when delivered, of the type then manufactured by the first party under Turney's inventions.

The defendant's agreement then was that the defendant was to manufacture and furnish the plaintiff a pneumatic player action, to be in all respects constructed and built in

conformity with the type selected and set apart by the parties
to the agreement. The type was the same as that then manu-
factured by the company, the workmanship and the material
used in the manufacture of it to be first class. When the
defendant complied with this requirement of this contract, it
performed its whole duty to the plaintiff. That it did not
perform the work that the parties expected of it furnishes no
ground for complaint; for the plaintiff received all from the
defendant that it bargained for,—all that it was entitled to
under the contract,—and there is no implied agreement that
it should have more. The contract is plain and unambiguous
on this point, supplemented by the later provisions of the con-
tract that, in the event there were improvements upon the
invention, another type might be substituted for the one
named in the contract.

Nowhere does the record disclose that the defendant ever
refused to furnish the plaintiff with a pneumatic player
action, such as is called for by the contract. The most that
can be contended for under the evidence is that the player
action, as then manufactured and designated as "Type A",
did not perform the functions for which it was designed;
that this was discovered by the parties later; that the defend-
ant told the plaintiff that there was a defect in the design or
scheme or invention, and that it could not be made to work
satisfactorily; that, after notice of this fact, the plaintiff
refused or neglected to furnish the defendant any more pianos
on which to have installed these players; failed to furnish
the defendant any more plans or specifications for the making
of these machines. It seems to be assumed, and was assumed
by the plaintiff, that, because defendant said it could not make
these machines to do the work, and that they would fall down
and not perform their proper function, thereby the defend-
ant repudiated the contract and relieved plaintiff from any
further obligation under this contract. Nowhere in the record
is there any evidence of a refusal, on the part of the defendant,
to furnish machines to the plaintiff, constructed and made

exactly in accordance with the type set apart and marked as "Type A". As late as the 15th day of October, 1910, the plaintiff returned to the defendant actions installed by the defendant in pianos furnished by the plaintiff, on the alleged ground of a failure of the action to comply with the contract. About this time, plaintiff closed its business, and furnished no further pianos to the defendant for installment of actions, nor did it thereafter furnish any plans or specifications for the making of players.

Upon this state of the record, the defendant complains of the action of the court in giving the fourth instruction, given by the court to the jury. The fourth instruction is as follows:

"It appears that in making and furnishing the players, conceded to have been furnished to plaintiff in pursuance of said contract, the defendant attempted to comply therewith, and it further appears that prior to October 15, 1910, the defendant had concluded that the players furnished and pianos manufactured by them were faulty in design, and that it could not comply with its contract, and so informed the plaintiff. Under such circumstances, the plaintiff was not bound to thereafter furnish defendant pianos or specifications for such players, and any failure so to do will be no bar to plaintiff's recovery herein, if you find other elements essential to his recovery established as hereinafter explained."

The complaint of this instruction is that the court told the jury that no obligation rested on the plaintiff after the 15th day of October to comply with its part of the contract to furnish pianos, or plans and specifications for the install-ing or making of these piano players,—inferentially telling the jury that the defendant had so breached its contract that it relieved the plaintiff from further obligation under the con-tract, and left the defendant liable for the full penalty for a failure to furnish piano players for the balance of the year,—

and said to the jury that the fact that after the 15th day of October the plaintiff had not furnished the defendant with pianos or specifications for players would not relieve the defendant company from its obligation to pay the liquidated damages provided for in the contract for the balance of the year.

We think that, in this instruction, the court misconstrued the contract between the parties, and assumed a state of facts not warranted by the record. The defendant had not agreed to furnish a piano player that was faultless in design; nor did its failure to furnish piano players faultless in design breach its contract. Therefore, its conclusion that it could not furnish faultless players did not breach its contract. Nor would its communication to the plaintiff that it could not furnish, under the contract, players faultless in design, or even the fact that the players furnished were not faultless in design, breach the contract. Its contract was to furnish players made in accordance with the Turney invention, whether the scheme or design of the Turney invention was faultless or otherwise. To say to the plaintiff that the invention of Turney was faulty in design, and that, therefore, they could not furnish, under this invention and design, a faultless player, was simply to inform the plaintiff of the fact, but could not be construed into saying that they would not furnish players, in accordance with this faulty design, strictly in accordance with their contract.

The instruction tells the jury, in substance, that, if the defendant discovered that the Turney invention was faulty, and that, therefore, players manufactured in accordance with this faulty design were themselves faulty, because of the faulty design, and so informed the plaintiff, this would be a breach of the contract on the part of the defendant, such as would relieve the plaintiff from any further obligation to perform its part of the contract, and make the defendant liable, not for a failure to deliver piano players faulty in design, but rather for a failure to deliver that which they

had not agreed to deliver, to wit, players faultless in design. The scope and purpose of this instruction was to tell the jury that the defendant company had agreed in its contract to furnish to the plaintiff players, manufactured by them, faultless in design; that they had concluded that they could not do this and so informed the plaintiff; that, by this conclusion and this information, so imparted, they repudiated the contract, thereby leaving the plaintiff untrammeled to sit in patient waiting until the expiration of the year, without offer to perform on its part, and at the end of the year to recover the liquidated damages provided for in the contract.

In Mechem on Sales, Vol. 2, Sec. 1350, it is said:

"There will be no warranty of fitness implied, although the use be known and the seller is the manufacturer, where the buyer has expressly specified the quality, dimensions, or characteristics which the article to be supplied shall possess, the materials of which it is to be made, or the method by which it is to be produced. The buyer here evidently relies upon his own knowledge or judgment, and not upon the judgment, knowledge, or experience of the seller. In all these cases, if the buyer doubts the sufficiency of the article which he orders, or is unwilling to rely upon his own experience or knowledge, he must exact an express warranty; none will be implied."

In *McCray Refrigerator & Cold Storage Co. v. Woods,* 99 Mich. 269 (41 Am. St. 599), a distinction is made between a case where a thing is ordered for a special purpose, and where a special thing is ordered, although it be intended for a special purpose. It is said:

" 'If a man buy an article for a particular purpose, made known to the seller at the time of the contract, and rely upon the skill or judgment of the seller to supply what is wanted, there is an implied warranty that the thing sold will be fit for the desired purpose.' But it is a rule of general applica-

tion that warranties, whether expressed or implied, can only issue from the contract itself; and it must be a legal deduction, and cannot depend upon extrinsic evidence.''

The distinction between the cases in which a warranty is implied and where it is not implied is that in one case a person buys a distinct thing, an exact article, and gets the thing he bargained for. He cannot complain that it does not accomplish the purposes for which he purchased it, although he communicated that purpose to the seller. In such cases, he takes his own risk as to the fitness of the thing for the intended purpose, and no warranty is implied. This rests upon the thought that no one can complain of another, or charge him with fault, who gives to him the exact thing which he bargained to give, although it is not fit for the purposes for which the purchaser bought it. The other class of cases is where one buys an article to be used for a certain purpose, and the seller undertakes to furnish him the article required. There is, in such a case, an implied warranty that it is fit for the purposes for which it is bought. The rule is laid down generally that, where a known, described and definite article is ordered of a manufacturer, although it is said to be required by the purchaser for a particular purpose, still, if the known, defined and described thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer. The distinction is between the manufacture and supply of an article to satisfy a required purpose, and the manufacture or supply of a specified, described and defined article. In one case, there is an implied warranty; and in the other, there is none. As supporting these conclusions, see *Seitz v. Brewers Refrigerating Machine Co.,* 141 U. S. 510 (35 L. Ed. 837); *Rollins v. Eastern Forge Co.,* (N. H.) 59 Atl. 382; *Peoria Grape Sugar Co. v. Turney,* (Ill.) 51 N. E. 587; *Davis Calyx Drill Co. v. Mallory,* 69 L. R. A. (O. S.) 973; *La Crosse Plow Co. v. Helgeson,* (Wis.) 106 N. W. 1094. This last case involved the sale of a cream separator, which was ordered and sold

under the name of the North Western Cream Separators. These articles were manufactured and known in the trade. The defendant received a North Western Separator. The court said:

"Defendant received exactly the articles which he contracted for. The rule is that when a person contracts for a known, specified, and described article and receives that article, there is no implied warranty of fitness for any purpose. If the purchaser obtains no express warranty, he assumes the risk of fitness,"—citing *Milwaukee Boiler Co. v. Duncan*, 87 Wis. 120 (58 N. W. 232, 41 Am. St. R. 33).

See, also, *Cosgrove v. Burnett,* (Minn.) 20 N. W. 359. In this case, the opinon shows that, after a personal examination of a model and witnessing its operation, and after hearing a description and explanation of the machine and its design, defendant determined to order one for his own use, and entered into a contract accordingly. Thereupon, there was manufactured and delivered to him a machine in all respects in conformity with the model designed and specifications exhibited. There was a warranty that it was well made and of good material. The defense was that the mill purchased was faulty in design and was unfit for practical use or for the use intended. It was insisted that there was an implied warranty that it was fit for such purpose. The court said, in substance: It is true, as found by the court, that the purchaser was influenced by the opinion and recommendations of the seller, as well as by his own personal examination of the model and its operation; but, nevertheless, the contract called for an article of this particular pattern and design, and, therefore, the contract was satisfied by the article delivered. If he desired further protection or guaranty as to the success of its practical operation, he should have seen to it that the proper stipulation was inserted in the contract to that effect. The court, in disposing of the case, said, in sub-

stance: Where an article ordered was to be of a particular design or pattern, well-defined and understood between the parties, and the article made and delivered in pursuance of the contract conforms to the pattern or model, there is no warranty implied further than that it should be of good workmanship and material.

In the sixth instruction, the court emphasized the error made in the fourth by saying to the jury: "In considering the claim made by the plaintiff, you will bear in mind that it appears without question that the defendant failed to furnish the plaintiff any player actions after October 15, 1910, and thus committed a breach of its contract."

This is one of the errors assigned, and we think it is well taken under the record.

II. In the original petition, the plaintiff claimed a penalty for failure to deliver the players up to January 1, 1911. In this action, an attachment was issued and certain property of the defendant levied upon. Thereupon, the defendant, with sureties, gave a bond in the sum of $7,000 to perform any judgment that might be rendered against the defendant in the cause; and thereupon, the property attached, under the writ, was released and discharged.

This action was commenced on the 3d day of January, 1911. On the 16th day of October, 1912, plaintiff filed a supplemental petition seeking to recover the penalty from January 1, 1911, to March 15, 1911, claiming a further breach of the contract after the filing of the petition. There was objection urged by the sureties as to any liability upon the bond for any breach of the contract made after the filing of the original petition in the suit in which the attachment was given.

In the view we take of this case, it is not necessary to pass upon this question; but for the errors pointed out, the case must be and is—*Reversed.*

LADD, EVANS, PRESTON and SALINGER, JJ., concur.

DEEMER, C. J. (dissenting).—I am unable to agree to the propositions of law announced by the majority. I think there was both an express and an implied warranty of the quality of the piano players, and I am convinced, also, that the defendant voluntarily failed to comply with the terms of its contract, in that it neglected to furnish plaintiff with any players after October 15, 1910. This latter fact is not disputed in the testimony, and the trial court did not err in its sixth instruction in stating the undisputed facts. The contract expressly provided and warranted that the players "would be of first class material and workmanship, free from flaws or defects and in good working order at the time of delivery". The contract expressly stated that this was a warranty, and I am led to inquire what is meant by the phrase, "in good working order at the time of delivery". Obviously, to my mind, this means that the machine should be so perfected that, when installed for the purpose for which it was made, it would do the work intended; such seems to be the holding of the cases. *Myers v. Steel Machine Co.,* (N. J.) 57 Atl. 1080; *Bucy v. Pitts Agricultural Works,* 89 Iowa 464; *Davis v. Sweeney,* 75 Iowa 45; *Checkrower Co. v. Bradley,* 105 Iowa 537; *First National Bank v. Dutcher,* 128 Iowa 413; *Ideal Heating Co. v. Kramer,* 127 Iowa 137.

In the *Dutcher* case, *supra,* the undertaking of the seller was that "the machine is warranted to be of good material and workmanship and, when properly adjusted and operated, to do good work." In speaking of this, the court said: "This is probably neither more nor less than the warranty, which in the absence of the writing the law would imply, that the machine was reasonably well made, of good material, and adapted to the uses and purposes for which it was constructed."

In the *Heating Company* case, *supra,* the court said: "Without at this time considering whether defendant may rely upon any implied stipulation or agreement, we have to say that, in our judgment, the plaintiff, in agreeing to do the

work 'in a good and workmanlike manner', did undertake to produce definite and certain results. The stipulation means something more than a promise to do a job which shall look well—something more than a good example of pipe fitting. A grist-mill which will not grind, a reaper that will not cut grain, a locomotive that will not move when the proper power is applied, can hardly be said to have been constructed in a good and workmanlike manner. Even so a heating apparatus that will heat nothing but the owner's temper must be said not to fill that condition. If a professional ditcher undertakes to drain a swamp in a good and workmanlike manner, but by a miscalculation makes the outlet of his ditch higher than the surface of the swamp, it will not avail him to say that the trench was evenly dug, and the tile laid with perfect regularity. A good and workmanlike job is one that is done as a skilled workman should do it. *Fitzgerald v. La Porte,* 64 Ark. 34 (40 S. W. 261) ; *Smith v. Clark,* 58 Mo. 145.''

In the *Checkrower* case, *supra,* the plaintiff warranted the machines ''to be well made and finished'', and the defense was that they were not as warranted and were wholly unfit for the purpose of cutting corn. Speaking upon the question of warranty, both express and implied, the court said: ''Plaintiff contends that there was no breach of the warranty, for that the warranty was that the machines were 'well made and finished'. The contract was made after inspection of a sample machine, and plaintiff insists that, if the machines furnished were made and finished as this sample was made and finished, there was no breach of the warranty, and insists that the evidence so shows. The warranty expressed is not that the cutters were made and finished as per sample, but that they were well made and finished. If it should be said that this is not a warranty that the cutters were fit for the purpose for which they were intended, we think that such a warranty must be implied. In *Blackmore v. Fairbanks, Morse & Co.,* 79 Iowa 289, this court said as follows: 'The rule in regard to an implied warranty of quality has been stated as

follows: "So far as an ascertained specific chattel, already existing, and which the buyer has inspected, is concerned, the rule of *caveat emptor* admits of no exception by implied warranty of quality. But where a chattel is to be made or supplied to the order of the purchaser, there is an implied warranty that it is reasonably fit for the purpose for which it is ordinarily used, or that it is fit for the special purpose intended by the buyer, if that purpose be communicated to the vendor when the order is given." 2 Benjamin, Sales, Sec. 966. See, also, *King v. Gottschalk*, 21 Iowa 513. In this case, plaintiff had not inspected the property ordered, and had no opportunity to do so, when the order was given. On the other hand, defendant knew the use for which the property was intended. Therefore, unless excluded by the terms of the order, there was an implied warranty that the property was fit for the designed use, and that it was in merchantable condition. Appellant contends that the order, in effect, contains an express warranty that the property shall be in good order; hence, that implied warranties must be excluded. It is true that, as a general rule, no warranty will be implied where the parties have expressed in words the warranty by which they mean to be bound (2 Benjamin, Sales, Sec. 1002); but the rule does not extend to the exclusion of warranties implied by law, where they are not excluded by the terms of the contract. Thus, an express warranty of title does not exclude an implied warranty of quality,'—citing cases. It is further said: 'A warranty will not be implied in conflict with the expressed terms of the agreement; but there is no conflict of that kind in this case.' The same is true of the case at bar, and we think that it should be implied if it is not expressed, that the cutters were reasonably fit for the purpose for which they were intended."

To my mind, this case fully settles every proposition involved in the one now under consideration. In that case, the machine was a corncutter known as the "Better Way Corncutter"—Harry Willits patent—and there was a sample

machine. If there was no express warranty, then the question arises as to whether one will be implied or not. If there was no express one, then no difficulty arises regarding any conflict between an express and an implied one created by law. The rule in this state, as I understand it, is as stated in *Loxtercamp v. Implement Co.*, 147 Iowa 29, as follows:

"We do not understand counsel to deny the proposition that, generally speaking, in an executory contract for sale of personal property when the thing sold is not present for inspection and delivery, or where a dealer undertakes to furnish an article to fill the order of one who buys for resale or for any other known or specified use, a warranty is implied that it is of merchantable quality, and this is ordinarily held to mean or include an assurance that such article (if a product of manufacture) is well made, of good material, and reasonably well fitted for the uses for which it is constructed or furnished. *Davis v. Sweeney*, 75 Iowa 45; *Russell v. Critchfield*, 75 Iowa 69; *Checkrower Co. v. Bradley*, 105 Iowa 537; *Blackmore v. Fairbanks*, 79 Iowa 282; *Parsons v. Mallinger*, 122 Iowa 703; *Bank v. Dutcher*, 128 Iowa 413. In some states the rule may be somewhat narrower than is here stated, but it is too well settled in our own jurisdiction to admit question. . . . Though such is not the universal holding, it is the rule in this state that a written contract of sale and written warranty do not necessarily deprive the buyer of the benefit of an implied warranty. *Bucy v. Pitts*, 89 Iowa 464; *Checkrower Co. v. Bradley*, 105 Iowa 537; *Heating Co. v. Kramer*, 127 Iowa 142. Our attention is directed to nothing in the writing which is inconsistent with the existence of an implied warranty."

See, also, *Heating Co. v. Kramer, supra; Pew Co. v. Karley & Titsenor*, 154 Iowa 559; *Conkling v. Standard Oil Co.*, 138 Iowa 596; *Parsons v. Mallinger*, 122 Iowa 703; *Checkrower Co. v. Bradley, supra; Bucy v. Pitts, supra; McClung*

*v. Kelley,* 21 Iowa 508; *Blackmore v. Fairbanks,* 79 Iowa 282; and *Davis v. Sweeney,* 75 Iowa 45. Many of these cases involve specific articles, some of them patented and all open to the inspection of the buyer, and in one case there was a sample machine. In the *Davis* case, the article was a threshing machine; in the *Blackmore* case, it was an engine and boiler, the engine being described as a standard Westinghouse engine; in the *Bucy* case, it was a threshing machine; in the *Parsons* case it was a band-cutter and self-feeder; in the *Checkrower* case, *supra,* it was a corncutter made under the Harry Willits patent; in *Pew's* case, it was an electric engine; in the *Heating* case, it was a plumbing outfit; in the *Loxtercamp* case, it was a manure spreader; in the *National Bank* case, it was a corn husking and shredding machine.

In my opinion, the *Checkrower* case, *supra,* is determinative of every question discussed by the majority in their opinion, and it reaches a conclusion entirely contrary to that announced in this opinion. I am confining my discussion to the point made by the majority for a reversal and am convinced, after a study of our cases, that no matter what the rule in other states, we are committed to the doctrine that there was both an express and implied warranty which was broken by the defendant, and that defendant, by reason of that fact, failed to comply with its contract and is liable for the damages fixed therein. I would therefore affirm.

WEAVER, J.—I concur in the foregoing dissent.